**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.:  3:22-CV-121 |
| | ) |
| **PHILLIP W. OFFILL, JR. and** | ) JURY TRIAL DEMANDED |
| **JUSTIN W. HERMAN,** | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT

Plaintiff U.S. Securities and Exchange Commission (the "Commission" or "SEC") alleges:

## NATURE OF THE ACTION

1.      The Commission brings this action against convicted felon Phillip W. Offill, Jr. ("Offill") and his accomplice, Justin W. Herman ("Herman," and together with Offill, "Defendants").  Defendants orchestrated and carried out a fraudulent scheme to misappropriate and then sell millions of shares of stock in Mansfield-Martin Exploration Mining, Inc. ("Mansfield") (OTC: MCPI).  As part of their scheme, Defendants forged documents and entered into sham transactions to make it appear as though transfers of stock they directed were authorized and legitimate.  Defendants then reaped hundreds of thousands of dollars in illicit profits by dumping millions of shares that did not belong to them into the market in just a few months, while the legal owner of these shares did not authorize their sale and, in fact, had no intent to sell the shares at that time.

2.      Shortly upon being released from prison in January 2016 after serving an eight-year sentence for participating in "pump-and-dump" schemes involving penny stocks,[1] Offill commenced a new illegal scheme involving penny stocks.  Offill obtained a position of trust and confidence with the then-controlling shareholder of Mansfield ("Shareholder 1"), whom Offill had known before going to prison and with whom Offill began sharing office space upon being released from prison.  Offill, operating under the alias "Jim Jimerson" to conceal his actual identity, used his position of trust and his proximity to Shareholder 1 to coordinate, in three different sets of transactions, the fraudulent transfer of 40 million shares of Mansfield stock owned by Shareholder 1.  Rather than selling the stolen stock himself, which he was prohibited from doing by an order imposed by this Court in a previous SEC enforcement action, Offill enlisted Herman to sell the stock and for the Defendants to share in the sales proceeds.

3.      Offill misappropriated Mansfield stock in two different ways.  First, on two separate occasions, Offill manipulated Mansfield into issuing, and Mansfield's transfer agent into transferring, a total of 25.5 million shares to Offill's associates, including Herman, purportedly in satisfaction of convertible debt that Shareholder 1 held.  Offill prepared and transmitted to Mansfield executives and Mansfield's transfer agent, among others, multiple fabricated documents.  Offill's actions fraudulently induced Mansfield to issue shares based on the false impression, created by Offill, that Shareholder 1: (i) made a demand on Mansfield to issue shares in partial satisfaction of convertible debt that Shareholder 1 held; and (ii) directed Mansfield (and its transfer agent) to issue the shares directly to Offill's associates, including Herman.  In reality,

---

[1] A "pump-and-dump" is a type of securities fraud in which the perpetrators manipulate the price and/or volume of a particular stock in order to later sell that stock at an artificially inflated price.  Pump-and-dumps often involve penny stocks, which are stocks publicly quoted on U.S. over-the-counter markets and have share prices ranging from just pennies to as much as five dollars.

Shareholder 1 never made a demand to convert debt he held into Mansfield stock and did not authorize the transfer of the stock to Offill's associates, including Herman.

4.      Second, Offill fraudulently induced Mansfield's transfer agent into transferring another 15 million shares of Shareholder 1's Mansfield stock to Herman.  Offill and Herman used forged documents and sham agreements to deceive Mansfield, its transfer agent, and a broker-dealer into effectuating this transfer.  Shareholder 1 did not authorize Offill, Mansfield, or the transfer agent to transfer any of his Mansfield shares to a third party.

5.      For his part, Herman sold most of the Mansfield stock that Offill had fraudulently transferred to him in over-the-counter ("OTC") market transactions, and split the sales proceeds with Offill.  At all times, Herman understood, or was severely reckless in not knowing, that Offill was not the rightful owner of these shares.  Herman also knew, or was severely reckless in not knowing, that he did not receive this stock as part of a legitimate transaction and that he was selling the stock for Offill's benefit.  Offill reaped illicit profits of approximately $386,000, while Herman reaped illicit profits of approximately $935,000.

6.      Through their actions, Defendants violated, and unless enjoined will continue to violate, the antifraud provisions of the federal securities laws, namely Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)], and Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1) and (3)].

7.      To protect the public from further harm and fraudulent activity, the SEC brings this action against Defendants and seeks: (i) permanent injunctive relief; (ii) disgorgement of ill-gotten gains, plus prejudgment interest; (iii) civil penalties; and (iv) a penny stock bar against Herman.

**DEFENDANTS**

8.      **Phillip W. Offill, Jr.** resides in Dallas, Texas.  On June 14, 2007, the Commission

charged Offill with violating Section 5 of the Securities Act in connection with his role in a pump-

and-dump scheme involving a penny stock company.  *SEC v. Fisher, et al.*, No. 2:07-cv-12552

(E.D. Mich.).  On August 19, 2011, the U.S. District Court for the Eastern District of Michigan

entered a final judgment against Offill that permanently enjoined him from violating Section 5 of

the Securities Act and ordered a penny stock bar[2] and disgorgement with prejudgment interest.

On September 27, 2007, the Commission charged Offill with violating Section 5 of the Securities

Act in connection with his role in a scheme to evade the securities-registration provisions of the

federal securities laws by offering and selling the securities of several companies to the public

when no registration statements were in effect for the transactions.  *SEC v. Offill, Jr.*, *et al.*, No.

3:07-cv-01643 (N.D. Tex.).  On April 10, 2012, this Court entered a final judgment against Offill

that permanently enjoined him from violating Section 5 of the Securities Act and ordered another

penny stock bar, disgorgement with prejudgment interest, and a civil penalty.  In 2009, Offill was

charged, and in January 2010 he was convicted, on several counts, including conspiracy to commit

securities registration violations, securities fraud, and wire fraud.  *United States v. Offill,* No. 1:09-

CR-00134-001 (E.D. Va.).  The criminal charges against Offill stemmed from his participation in

a pump-and-dump scheme to illegally issue shares of a penny stock company and manipulate its

stock price.  In April 2010, Offill was sentenced to a prison term of 96 months.  In June 2010,

Offill was suspended from appearing or practicing before the Commission as an attorney pursuant

to Rule 102(e)(2) of the Commission's Rules of Practice based on his criminal conviction.  *In the*

---

[2] The District Court ordered that Offill be "permanently barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock. . . ."

*Matter of Phillip Windom Offill, Jr.*, Exchange Act Rel. No. 62367 (June 23, 2010).  Offill was a licensed Texas attorney before the State Bar of Texas suspended him from practicing in October 2010 and subsequently disbarred him.

9.      **Justin W. Herman** resides in Canonsburg, Pennsylvania.  On October 8, 2021, Herman was convicted on several counts, including conspiracy to commit securities fraud and wire fraud, in connection with his role in a pump-and-dump scheme.  *United States v. Herman*, No. 2:19-CR-00026 (D. Wy.)  Herman is awaiting sentencing.

<u>**Related Entity**</u>

10.      **Mansfield-Martin Exploration Mining, Inc. ("Mansfield")** is a company incorporated in Nevada and headquartered in Tombstone, Arizona.  Mansfield describes itself as being engaged in mining activities in Arizona and Idaho.  Until August 27, 2019, Mansfield had a class of shares registered under Section 12(g) of the Exchange Act, and Mansfield's common stock was quoted on OTC Link (operated by OTC Markets Group, Inc.) under the symbol MCPI.  On August 27, 2019, the Commission suspended trading in Mansfield pursuant to Section 12(k) of the Exchange Act and, on October 30, 2019, the Commission revoked Mansfield's registration pursuant to Section 12(j) of the Exchange Act.

11.      Mansfield was previously known as MCPI, Inc. ("MCPI").  MCPI described itself as a company specializing in medical cannabis retail distribution.  On November 28, 2016, MCPI entered into an agreement that provided for MCPI to issue over 284 million shares of its common stock to Armada Mining, Inc. ("Armada") in exchange for rights and interests in Armada's mining properties in Arizona.  As contemplated by the agreement (as well as a related agreement), upon closing of the transaction: (i) Armada would own approximately 85% of MCPI, (ii) MCPI's director would appoint three directors designated by Armada and then resign, and (iii) MCPI would

change its name to Mansfield.  MCPI appointed the new Armada-designated directors on or about

November 30, 2016, and MCPI changed its name to Mansfield in March 2017.  The transaction

closed on or around June 27, 2017.

**JURISDICTION AND VENUE**

12.   The Commission brings this action pursuant to authority conferred upon it by

Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d)

and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)].

13.   This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15 US.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15

U.S.C. §§ 78u(d), (e), and 78aa].

14.   In connection with the conduct described in this Complaint, Defendants, directly or

indirectly, made use of the mails or the means or instruments of transportation or communication

in interstate commerce, including but not limited to email, wiring of funds, and use of brokerage

accounts.

15.   Venue is proper in this District because Offill resided in this District at all relevant

times.  Further, acts, transactions, and courses of business constituting violations of the securities

laws alleged in this Complaint occurred within this District, including Offill's transmission of

documents that effectuated his scheme and Offill's receipt of proceeds from the scheme from

Herman.

**FACTUAL ALLEGATIONS**

**I.      Upon His Release from Prison, Offill Returns to the Penny Stock Market**

16.   In January 2016, Offill was released from prison after serving an eight-year

sentence for his role in a pump-and-dump scheme involving penny stocks.  Several months after

being released, Offill, a disbarred attorney who held himself out as a paralegal, began working

6

from an office suite in Dallas, Texas that was occupied by Shareholder 1.  Before Offill went to prison, Shareholder 1 had worked with Offill on penny stock business transactions not related to Mansfield, MCPI, or transactions that were the basis of prior SEC enforcement actions against Offill and of his criminal conviction.

17.    Shareholder 1's office was located in a suite with multiple workspaces, one of which Offill used with Shareholder 1's permission.  None of the workspaces inside Shareholder 1's suite were separated by locked doors.  Accordingly, anyone in the office suite could access the workspace of any other person in the suite.  During 2016 and 2017, there was one person besides Shareholder 1 and Offill who worked in Shareholder 1's office suite.

18.    From at least the time that Offill started working in Shareholder 1's office suite in or around November 2016 through August 2019, Offill used the alias "Jim Jimerson" in most of his business-related communications.  Upon information and belief, Offill used this alias to conceal his felony conviction and penny stock bars from market participants, including an issuer, broker-dealers, and a transfer agent that are charged with certain gatekeeping functions under the federal securities laws.

19.    At the time that Offill began working in Shareholder 1's office suite in 2016, Shareholder 1 was the controlling shareholder of MCPI.  Shareholder 1 also was a holder of a promissory note from MCPI that, as of November 2, 2016, had a balance of $867,036 and was convertible to MCPI shares at a rate of $0.001 per share (the "Convertible Promissory Note").  As evidenced by a Form 10-Q filed with the SEC on October 31, 2016, Shareholder 1 "verbally suspended the common stock conversion clause at the execution date of the note and said suspension remains in effect as of [September 30, 2016]."

20.     In or around April 2016, Offill began informally consulting with Armada.  Armada was then a privately-held company purportedly engaged in mining activities in Arizona and Idaho. Armada was looking to access the public capital markets, and Offill assisted Armada in finding and evaluating potential transactions.

21.     As Offill was assisting Armada, he became aware that Shareholder 1, who had been funding certain of MCPI's costs, wanted to relinquish his control over MCPI.  Offill referred Armada to MCPI and Shareholder 1 as a potential transaction opportunity.  He then worked to facilitate the change of control transaction between the two companies.

22.     By November 2016, Offill had become deeply involved with MCPI.  He drafted its November 28, 2016 Form 8-K announcing the transaction with Armada.  Offill also ingratiated himself further with Shareholder 1.  After the Armada transaction was announced, Shareholder 1 requested that Offill assist him with a transfer of Shareholder 1's Mansfield shares from an offshore broker to Mansfield's onshore transfer agent, which Offill agreed to do.

23.     As discussed in further detail below, Offill's work for MCPI and Mansfield, his close physical proximity to Shareholder 1 (at Shareholder 1's office suite), and his knowledge of Shareholder 1's securities holdings gained from assisting with on-shoring Shareholder 1's Mansfield stock, created an opportunity for Offill to repeatedly enrich himself and Herman through fraudulent transfers of Mansfield stock from Shareholder 1.

## II.     The First Fraudulent Scheme:  Offill's Misappropriation and Herman's Sale of 1.5 Million Shares of MCPI Stock

24.     As detailed below, Offill deceived MCPI into converting a portion of the amount outstanding under Shareholder 1's Convertible Promissory Note into 1.5 million shares of MCPI stock.  Offill next attempted to manipulate MCPI's transfer agent into transferring this stock to Offill's accomplice ("Individual 1") in order for Individual 1 to sell the stock to the public.  Offill

needed an accomplice to sell the stock because he was barred by the Commission from trading penny stocks based on his prior violations of the federal securities laws, and it was thus unlikely that a brokerage firm would permit him to transact in MCPI stock.  Before going to prison, Offill had worked on penny stock transactions with Individual 1.  Individual 1, however, was unable to deposit the MCPI stock into his own brokerage account and instead transferred the stock in a sham transaction to Herman.  Herman then sold the stock to the public and kicked back a portion of the proceeds to Offill.

A.   *Offill Deceives MCPI into Authorizing the Issuance of 1.5 Million Shares to Individual 1*

25.   On December 1, 2016, two days after MCPI announced the change of control transaction with Armada, Offill (as Jimerson) emailed MCPI's outgoing CEO and sole director. Among other things, Offill stated in his email that Shareholder 1 had made a demand under the Convertible Promissory Note for MCPI to issue shares in partial satisfaction of amounts due under the Convertible Promissory Note.  Offill falsely stated in his email that the purpose of Shareholder 1's demand for the issuance of shares was to cover Shareholder 1's "administrative expenses" related to MCPI, "so that [Shareholder 1] can stop writing checks."  Shareholder 1's purported demand came just weeks after MCPI had disclosed in its Form 8-K filed on October 31, 2016, that Shareholder 1 had verbally suspended the conversion clause on the Convertible Promissory Note.

26.   Offill attached two relevant documents to his December 1, 2016 email.  The first document was a letter purporting to be from Shareholder 1 to MCPI (the "Demand Letter").  The Demand Letter requested that MCPI convert, pursuant to the Convertible Promissory Note, $1,500 of debt on the note into 1.5 million shares of MCPI, and issue these shares to Individual 1.

27.   The Demand Letter purported to be signed by Shareholder 1, but the signature on the letter was not Shareholder 1's authentic signature.  Shareholder 1 never signed the Demand

Letter, which originated from Offill.  On information and belief, Offill drafted the Demand Letter and forged Shareholder 1's signature on it.

28.     The second document that Offill attached to his December 1, 2016 email was an MCPI corporate resolution, which Offill drafted.  The resolution effectuated the actions that Armada and MCPI agreed to as part of their transaction, including the issuance of MCPI stock to Armada, the appointment of three directors designated by Armada to MCPI's board of directors, and acceptance of the resignation of MCPI's sole director.  Importantly, the resolution also provided for the issuance of 1.5 million shares of stock in partial satisfaction of the amounts due to Shareholder 1 under the Convertible Promissory Note, in accordance with Shareholder 1's purported demand.  The resolution further specified that the stock to be issued in satisfaction of Shareholder 1's demand was to be issued to Individual 1.

29.     Contrary to the text of Offill's December 1, 2016 email, the attached Demand Letter, and the attached MCPI resolution, Shareholder 1 never made a demand on MCPI to issue 1.5 million shares pursuant to the Convertible Promissory Note.  Shareholder 1 did not authorize Offill to transmit on his behalf the Demand Letter, and Shareholder 1 was unaware of the existence of the Demand Letter or that it was transmitted to MCPI.  And, Shareholder 1 did not authorize any of his MCPI shares to be transferred to Individual 1.

30.     On December 2, 2016, MCPI's CEO signed the resolution that Offill had drafted and transmitted to him.

31.     The same day, December 2, 2016, Offill (as Jimerson) emailed MCPI's incoming President a copy of the resolution signed by MCPI's outgoing CEO.  In his email, Offill falsely referred to Individual 1 as "our finder."  Individual 1 did not act as a "finder" in relation to either Armada or MCPI.  Offill's statement to the incoming President asserting that Individual 1 was

being compensated with MCPI shares for his role as "finder" was contrary to Offill's representation to the outgoing CEO that the MCPI shares were to cover "administrative expenses" that Shareholder 1 had been bearing, which was also false.

B.   *Offill Assists Individual 1 in an Attempt to Deposit the MCPI Shares in Individual 1's Brokerage Account*

32.    Having succeeded in causing MCPI to issue 1.5 million shares of its stock, Offill set out to monetize his theft.  As set forth above, due to Offill's regulatory and criminal history, including the penny stock bars, it was highly unlikely that any broker would permit Offill to trade MCPI stock.  Offill therefore tapped Individual 1 to receive and sell for Offill's benefit the stock that Offill had misappropriated.

33.    The transfer, and ultimately the sale, of stock that Offill had misappropriated required action from MCPI's transfer agent as well as a broker-dealer.  Transfer agents and broker-dealers are charged with certain gatekeeping functions under the federal securities laws and other rules and regulations.  To satisfy these legal obligations, before transferring stock, transfer agents are required to attempt to ensure that the transfer is properly authorized by the transferor (in this case, MCPI) and determine whether the stock should bear a restrictive legend.  Shares issued without a restrictive legend are immediately and freely tradeable, while shares with restrictive legends may have certain time and volume limitations as prescribed by the federal securities laws and/or the issuer.  Similarly, before accepting certain stock for deposit into a customer's brokerage account, broker-dealers are required to conduct due diligence designed to ensure that the customer's acquisition of the shares and any potential trades in the shares are consistent with applicable law.

34.    In this case, Offill took several steps to deceive MCPI's transfer agent into transferring the 1.5 million of MCPI shares to Individual 1's brokerage account.  On or around

December 6, 2016, Individual 1 supplied Offill with a sham consulting agreement between Individual 1 and Shareholder 1 (the "Consulting Agreement"). The Consulting Agreement was dated March 1, 2016 and purported to provide for the engagement by Shareholder 1 of Individual 1 to provide various capital raising-related services in exchange for 1.5 million MCPI shares. Shareholder 1 did not sign the Consulting Agreement and did not engage Individual 1 to provide any services for him, including those described in the Consulting Agreement. On information and belief, after Offill received the Consulting Agreement from Individual 1, Offill forged Shareholder 1's signature on the document.

35.    Next, also on December 6, 2016, Offill (as Jimerson) emailed MCPI's transfer agent to request that the transfer agent, among other things, start the process of transferring 1.5 million MCPI shares to Individual 1. In support of this request, Offill attached to his email the fraudulent MCPI corporate resolution that he had drafted and deceived MCPI into adopting, which provided for the issuance of 1.5 million shares to Individual 1, purportedly at Shareholder 1's direction.

36.    Further, on December 27, 2016, Offill (as Jimerson) emailed Individual 1 the forged Demand Letter, the fraudulently obtained MCPI board resolution authorizing the issuance of 1.5 million MCPI shares to Individual 1, the sham Consulting Agreement, and an opinion letter of an attorney opining that the 1.5 million shares were freely tradeable.[3] The MCPI board resolution and the attorney opinion letter were provided to MCPI's transfer agent.

37.    On January 23, 2017, MCPI's transfer agent issued 1.5 million shares to Individual 1. Individual 1 then attempted to deposit these shares with his broker. However, the broker

---

[3] In offering his opinion, the attorney stated in the opinion letter that he relied on the accuracy and completeness of, among other documents, the Consulting Agreement, the MCPI board resolution, and the Demand Letter.

rejected the deposit because it concluded that SEC regulations imposed a holding period for these shares that Individual 1 had not satisfied.

C.   *Herman Fraudulently Obtains 1.5 million MCPI Shares, Sells them to the Public, and Kicks Back Proceeds to Offill*

38.   Undeterred by Individual 1's inability to deposit the shares with his broker, in or around January 2017, Offill and Individual 1 agreed that Individual 1 would transfer the shares to Herman, with whom Individual 1 had a pre-existing relationship.  Individual 1 had previously introduced Herman to Offill.  Individual 1 understood that Herman had the ability to "clear" (*i.e.*, deposit and then sell) penny stocks through Herman's broker.

39.   To make the transfer of the shares to Herman appear authorized and legitimate, Individual 1 and Herman entered into a purported stock purchase agreement (the "SPA"), dated February 2, 2017.  The SPA provided for the sale by Individual 1 of 1.5 million shares of MCPI stock to Herman for $150,000.

40.   However, the SPA was a sham.  Herman never paid $150,000 to Individual 1, and Individual 1 never sought to be paid the consideration under the SPA.   Individual 1 and Herman both understood that the SPA was a sham agreement designed to facilitate the transfer of shares to Herman.

41.    In or around February 2017, Individual 1 transferred the 1.5 million shares of MCPI stock to Herman, who successfully deposited them into his brokerage account.   To demonstrate that he obtained these shares legitimately, Herman provided his broker with a copy of the sham SPA.  Over the next several months, Herman sold these shares to the public in OTC transactions for proceeds of approximately $160,000.  Of this amount, he kicked back $30,000 to Offill.

42.     In or around April 2017, Offill demanded that Herman provide a reconciliation of his trading activity with respect to the MCPI shares he obtained from Individual 1.   In communicating his demand, Offill referred to Individual 1 as a "nominal" owner of the 1.5 million shares that Herman received.   Offill demanded a reconciliation because, according to Offill, Herman was slow to kick back a portion of the sales proceeds to Offill.

43.     Herman knew, or was severely reckless in not knowing, that the 1.5 million shares of MCPI stock did not rightfully belong to him, because he did not pay the consideration due under the SPA and Individual 1 never demanded it, and because he kicked back sales proceeds to Offill. For these same reasons, and based on his April 2017 share sale reconciliation communications with Offill, Herman also knew, or was severely reckless in not knowing, that Individual 1 was not the rightful owner of the shares.   Finally, because Herman kicked back a portion of the sales proceeds to Offill, Herman knew, or was severely reckless in not knowing, that he was selling the shares for Offill's benefit.   In sum, Herman knew, or was severely reckless in not knowing, that he was profiting from the sale of shares that did not belong to him or Individual 1.

### III.    The Second Fraudulent Transaction: Offill's Misappropriation and Transfer to Herman of Another 15 million Shares of Mansfield Stock

44.     Emboldened by his success in effecting the issuance, transfer, and sale of 1.5 million shares of stock that did not belong to him, in or around July 2017, Offill seized another opportunity to enrich himself and Herman at the expense of Shareholder 1 through the deceitful transfer of millions of additional shares of MCPI (by this time, renamed Mansfield).

45.     In or around spring 2017, Shareholder 1 requested Offill's assistance to transfer onshore shares of Mansfield stock that Shareholder 1 held in an offshore brokerage account. Shareholder 1 sought Offill's assistance because he had known from previous experience with Offill that Offill was effective in facilitating such transactions.

46.     As requested by Shareholder 1, Offill facilitated the transfer of 15 million shares from Shareholder 1's offshore brokerage account to Mansfield's transfer agent.  The transfer was completed in or around April 2017.  As described in detail below in paragraphs 47 through 50, shortly thereafter Offill (as Jimerson) falsely told Mansfield's transfer agent that Shareholder 1 had sold these shares to Herman and instructed the transfer agent, purportedly on Shareholder 1's behalf, to transfer the shares to Herman's brokerage account.  In truth, Shareholder 1 was not aware of Offill's actions and did not authorize the transfer of 15 million Mansfield shares to Herman.

47.     On or about June 29, 2017, Offill (as Jimerson) emailed the transfer agent a share transfer instruction form that indicated that Shareholder 1 wished to transfer the 15 million shares to Herman in a share sale transaction for consideration of $750,000 (or $0.05 per share).

48.     The transfer form that Offill emailed to the transfer agent was fraudulent. Shareholder 1 did not wish to transfer any shares to Herman, did not authorize Offill to send this form on his behalf, and did not sign the form.  The form bore Shareholder 1's forged signature.

49.     Herman never paid Shareholder 1 $750,000 in connection with this transfer, and Shareholder 1 never demanded such a payment.  Herman knew, or was severely reckless in not knowing, that he was not the rightful owner of the 15 million MCPI shares transferred to him, and that Shareholder 1 did not authorize Herman to receive this stock.

50.     On or about July 11, 2017, Mansfield's transfer agent followed Offill's instructions and processed the transfer of Shareholder 1's 15 million MCPI shares to Herman's brokerage account.

51.     After depositing the fraudulently obtained shares into his brokerage account, over the next three months Herman sold the vast majority of these shares to the public.  Herman realized proceeds of nearly $1.1 million from the sales of these shares, the vast majority of which he

deposited into his personal bank account.  Herman kicked back approximately $286,000 from those proceeds to Offill, either directly from his bank account or through two corporate accounts he controlled.  In the three-month time period in which Herman sold these shares, his sales accounted for approximately 25% of all sales of Mansfield stock.

## IV.   The Third Fraudulent Transaction: Offill's Misappropriation and Transfer to Individual 1 of Another 24 million Shares of Mansfield Stock

52.    Later in 2017, Offill again deceived Mansfield into issuing Shareholder 1's stock to Individual 1 based on: (i) another fake conversion demand pursuant to the Convertible Promissory Note, and (ii) a fraudulent agreement purporting to provide for an arms-length sale of stock to Individual 1.

53.    To accomplish this, in or around October 2017, Offill (as Jimerson) sent a demand letter, purportedly from Shareholder 1, to Mansfield's CEO requesting that Mansfield convert a portion of the outstanding debt under the Convertible Promissory Note to 24 million shares of Mansfield stock (the "Second Demand Letter").  On information and belief, Offill drafted the Second Demand Letter.  Offill also drafted a purported Stock Purchase and Services Agreement that provided for Shareholder 1 to sell to Individual 1 24 million shares of Mansfield stock in exchange for Individual 1 providing cash and various capital raising-related services.  Shareholder 1's signature on this agreement was forged.

54.    On or about October 25, 2017, Offill (as Jimerson) emailed Mansfield's President and CEO.  In his email, Offill informed the President and CEO that Shareholder 1 was making a repayment demand under the Convertible Promissory Note.  Offill also told the President and CEO that Mansfield should issue the shares in satisfaction of Shareholder 1's demand directly to Individual 1, pursuant to a consulting agreement between Shareholder 1 and Individual 1.  Offill attached to this email the Second Demand Letter as well an instruction form for Mansfield to

provide to its transfer agent to effectuate the transfer.  Offill completed all relevant fields on the instruction form other than the signature block that needed to be signed by a Mansfield officer.

55.    Shareholder 1 did not authorize Offill to draft or transmit on his behalf the Second Demand Letter or the Stock Purchase and Services Agreement, and Shareholder 1 was unaware that Offill had done so.  Shareholder 1 did not sign the Stock Purchase and Services Agreement. Shareholder 1 did not demand from Mansfield repayment under the Convertible Promissory Note in the form of Mansfield shares.  And, Shareholder 1 did not enter into any agreement or arrangement with Individual 1 for the sale of stock or receipt of services.  Further, Individual 1 did not provide any payment or services to Shareholder 1 under the purported Stock Purchase and Services Agreement.

56.    On or around November 9, 2017, Offill provided the Second Demand Letter and Stock Purchase and Services Agreement to Individual 1.  Offill provided these documents so that Individual 1 could provide them to Individual 1's brokerage firm so that it would allow Individual 1 to deposit the 24 million Mansfield shares into his brokerage account.  When Individual 1 later presented the Second Demand Letter to his broker, it contained Shareholder 1's forged signature.

57.    On or around November 13, 2017, Offill (as Jimerson) emailed Mansfield's transfer agent to instruct the transfer agent to process the issuance of 24 million shares of Mansfield stock, in partial satisfaction of the Convertible Promissory Note, to Individual 1 pursuant to the Stock Purchase and Services Agreement.  Offill attached to his email the instruction form he had drafted, which had now been signed by Mansfield's President and CEO.  As described above, Offill provided this form to Mansfield's President and CEO and had obtained his signature by falsely representing that Shareholder 1 had demanded partial repayment under the Convertible Promissory

Note.  Offill also attached to his email an opinion letter from an attorney as to the transferability of these shares.[4]

58.     On or about December 13, 2017, the transfer agent issued 24 million shares of Mansfield stock to Individual 1, who was able to deposit these shares in his brokerage account based, in part, on the fraudulent Second Demand Letter and forged Stock Purchase and Services Agreement.

59.     Over the next several weeks, Individual 1 sold a portion (over 3.6 million) of the 24 million shares of the fraudulently obtained Mansfield stock for proceeds of approximately $127,000.  Individual 1 then kicked back approximately $70,000 of these proceeds to Offill.

60.     Subsequently, Offill made additional attempts to misappropriate Mansfield stock that Shareholder 1 owned.  Those attempts were unsuccessful, however.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules
10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]**

***Against All Defendants***

61.     Plaintiff re-alleges and incorporates paragraphs 1 through 60 of this Complaint by reference as if set forth verbatim in this Claim.

62.     By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, in connection with the purchase or sale of securities, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, knowingly or with severe recklessness:

    a.   employed a device, scheme, or artifice to defraud; and/or

---

[4] In offering his opinion, the attorney stated in the opinion letter that he relied on the accuracy and completeness of, among other things, the Second Demand Letter and the Stock Purchase and Services Agreement.

b.    engaged in an act, practice, or course of business which operated or would

operate as a fraud or deceit upon any person.

63.    By reason of the foregoing, Defendants violated, and unless enjoined will continue

to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c)

thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

**SECOND CLAIM FOR RELIEF**
**Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act**
**[15 U.S.C. §§ 77q(a)(1) and (3)]**

***Against All Defendants***

64.    Plaintiff re-alleges and incorporates paragraphs 1 through 60 of this Complaint by

reference as if set forth verbatim in this Claim.

65.    By engaging in the acts and conduct alleged herein, Defendants, in the offer or sale

of securities, by the use of any means or instruments of transportation or communication in

interstate commerce or by use of the mails, directly or indirectly, have:

a.    knowingly or with severe recklessness employed a device, scheme, or

artifice to defraud; and/or

b.    knowingly, recklessly, or negligently engaged in a transaction, practice, or

course of business which operated or would operate as a fraud or deceit upon the purchaser.

66.    By reason of the foregoing, Defendants have violated, and unless enjoined will

continue to violate, Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and

(3)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

1.      Permanently enjoining the Defendants from violating Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)];

2.      Ordering the Defendants to disgorge ill-gotten gains as a result of the violations alleged herein, plus prejudgment interest on those amounts;

3.      Imposing civil penalties against Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

4.      Imposing an injunction that permanently restrains and enjoins each Defendant from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any securities provided, however, that such injunction shall not prevent Defendants from purchasing or selling securities for each of their own personal accounts;

5.      Permanently barring Herman from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.  A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. 240.3a51-1]; and

6.      Imposing such other and further relief as the Court may deem just and proper.

Dated:  January 19, 2022                     Respectfully submitted,

                                             *s/Nikolay V. Vydashenko*
                                             Nikolay V. Vydashenko
                                             Texas Bar No. 24057029
                                             United States Securities and Exchange Commission
                                             Fort Worth Regional Office
                                             801 Cherry Street, Suite 1900
                                             Fort Worth, Texas 76102
                                             (817) 900-2638 (phone)
                                             (817) 978-4927 (facsimile)
                                             vydashenkon@sec.gov

                                             ATTORNEY FOR PLAINTIFF U.S. SECURITIES
                                             AND EXCHANGE COMMISSION